IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| HAL JENKINS and CLJ HEALTHCARE, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>PRIME INSURANCE CO. et al.,<br><br>Defendants. | MEMORANDUM DECISION<br>AND ORDER<br><br>Case No. 2:21-cv-00130-DAK<br><br>Judge Dale A. Kimball |

## BACKGROUND

This matter is before the court on Defendants Prime Insurance Company ("Prime") and

Prime Holdings Insurance Services, Inc.'s, d/b/a Claims Direct Access' ("Claims Direct")

(collectively, "Defendants") Motion to Dismiss Counts Three, Four, Six, and Seven of Hal

Jenkins (assignee of CLJ Healthcare, LLC) and CLJ Healthcare, LLC's ("CLJ") Complaint.

(ECF No. 54.) This action arises from Plaintiffs' attempt to collect from Defendants a portion of

the $60,000,000 default verdict for wrongful death that Mr. Jenkins won against CLJ. At the time

of that verdict Defendants were CLJ's insurance companies.

***The Policy***

Prime issued professional liability insurance coverage to CLJ (the "Policy"). Prime is a

Utah company and all of its operations are in Utah. CLJ is a Georgia company that operates its

relevant surgical centers in Georgia. The Policy at issue lasted from December 22, 2012, through

December 22, 2013, and set forth a Professional Liability limit of $50,000 and an Aggregate

Limit of $100,000. The Policy contains provisions under which the limits were diminished if

Prime incurred costs in defending the insured. (*See* Policy, ECF No. 4-2 at 8–9 (noting that expenses paid in defense of a claim "shall directly diminish the respective Limits of Liability as stated on the Declarations").)

***The Jenkins Claim***

On February 19, 2013, April Jenkins died after a liposuction procedure performed at CLJ by Dr. Dodds. On August 5, 2013, Hal Jenkins, April's father and administrator of April's estate, filed a suit against CLJ and Dr. Dodds in Georgia, seeking to recover damages arising out of her death (the "Jenkins Claim"). Prime, as required by the Policy, defended CLJ and Dodds in that action, under a reservation of rights.

On August 22, 2013, Mr. McBride, Prime's Senior Vice-President and Corporate Attorney at that time, tendered $50,000 to Mr. Jenkins' attorney as a settlement offer. Mr. Jenkins rejected that tender. On April 11, 2014, Jenkins' attorney made a demand for $100,000. Prime responded by counteroffering $39,000, which was the amount allegedly remaining on the Policy since Prime's defense had diminished the amount available under the Policy. Mr. Jenkins also rejected this offer.

On May 6, 2014, Prime notified CLJ that Prime had completely depleted the Policy's Professional Liability Limit of $50,000. Thus, Prime withdrew from representing CLJ and Dr. Dodds pursuant to a court order dated July 8, 2014. Mr. Jenkins then dropped Dr. Dodds from the lawsuit and proceeded against CLJ. CLJ did nothing to protect its interest and the case proceeded to trial. During the trial, CLJ was unrepresented and a jury awarded $60,000,000 to Jenkins on December 18, 2018.

### *Utah Declaratory Judgment Action*

On January 27, 2015, Prime filed a declaratory judgment action in the Third Judicial District Court of Salt Lake County, Utah. *See Prime Insurance Co. v. Nedra Dodds, M.D. and CLJ Healthcare, LLC d/b/a Opulence Medicine*, Case No. 150900592 (Jan. 27, 2015) [hereinafter the Declaratory Judgment Action]. (ECF No. 4-6.) The Declaratory Judgment Action arose out of two wrongful death claims made against CLJ and Dodds, the Jenkins claim and the Bearun claim. Prime sought a declaratory judgment that it owed no further obligations under the Policy for those claims because the Policy's limits had been exhausted.

Despite being served with the Declaratory Judgment Action via United States Mail, as authorized by court order, CLJ and Dodds failed to appear. Naturally, Prime moved for default judgment. After a bankruptcy stay was lifted with respect to the Jenkins claim, Prime filed a Renewed Motion for Default Judgment on February 14, 2019—two months after Mr. Jenkins received the $60 million verdict in his favor. In support of this renewed motion, Prime attached various documents including the Policy, pleadings from the Jenkins claim, and an affidavit from Mr. McBride.

On March 19, 2019, the Utah state court entered an order granting Prime's Renewed Motion for Default Judgment (the "Default Judgment"). (ECF No. 54-2.) The Default Judgment states, in relevant part, that:

> Jurisdiction and venue are proper in [Utah state court] and [Salt Lake County].
> ***
> (a) Prime has no obligation to defend or indemnify Dr. Dodds and/or CLJ in the Jenkins claim beyond the $50,000 Professional Liability limit applicable to that claim.
> (b) Prime also has no obligations under the Policy when the $100,000 [A]ggregate [L]imit is exhausted.
> (c) Inasmuch as Prime incurred in excess of $50,000 in defending the Jenkins claim, . . . it has no obligation to indemnify CLJ or Dr. Dodds for the judgment entered against them in the Jenkins lawsuit.

(ECF No. 54-2.)

On May 29, 2019, after obtaining the Default Judgment, Prime attempted to domesticate

that judgment in Georgia, invoking O.C.G.A. § 9-12-133, the Georgia Uniform Enforcement of

Foreign Judgments Act. (ECF No. 70-13.) Mr. Jenkins filed a motion to set aside the

domesticated judgment (ECF No 70-14) and a motion to intervene in the domesticated action.

(ECF No. 70-13, 70-15.) CLJ joined in the motion to set aside. (ECF No. 70-16.) The Superior

Court of Cobb County, Georgia, has not yet ruled on the motions filed by CLJ and Mr. Jenkins in

the Vacatur Action.

***The Present Action***

In March 2020, Mr. Jenkins, as the assignee of CLJ, and CLJ initiated the present action

in Georgia state court, seeking to recover a portion of the $60,000,000 judgment from Prime and

others. (ECF No. 1.) That action was subsequently removed to the United States District Court,

Northern District of Georgia. Defendants filed a Motion to Dismiss Counts One, Two, and Five

of Plaintiffs' Complaint. (ECF No 1, 4.) The court granted that Motion and dismissed

Defendants McBride and Evolution Insurance Brokers, LC. (ECF No. 47.) In that same order,

the Georgia court deferred on ruling on the remaining causes of action, finding that a Utah court

was better positioned to determine the controlling question of whether Prime's Default Judgment

has a preclusive effect on the remaining causes of action. (ECF No. 47 at 24.) Accordingly, the

case was transferred to this court for a determination on the remaining claims: Count Three for

breach of contract; Count Four for negligence; Count Six for punitive damages; and Count Seven

for attorneys' fees (the "Deferred Causes of Action"). (ECF No. 47 at 24.)

After the briefing was complete on the present motion, the court ordered the parties to

submit additional briefing on Utah's law regarding the elements of collateral estoppel. (ECF No.

4

80.) The additional briefing was timely filed by both parties. (ECF No. 81, 82.) Now that the

issues have been fully briefed, the court issues the following Memorandum Decision and Order.

**DISCUSSION**

Defendants bring a Motion to Dismiss Deferred Causes of Action: Count Three for

breach of contract; Count Four for negligence; Count Six for punitive damages; and Count Seven

for attorneys' fees. (ECF No. 1, 54.) To resolve this motion the court will address the following:

(I) the standard of review and applicable law; (II) the application of collateral estoppel; (III)

whether Plaintiffs must lodge a direct appeal of the Default Judgment; (IV) whether the Policy

itself is sufficient to dismiss the remaining causes of action; (V) whether Plaintiffs can assert a

stand-alone punitive damages claim; and (VI) whether Plaintiffs can assert a cause of action for

attorneys' fees.

## I.   Standard of Review & Choice of Law

Defendants bring their Motion to Dismiss under Rules 7 and 12(b)(6) of the Federal

Rules of Civil Procedure. Under a Rule 12(b)(6) motion to dismiss, a court must presume that all

well-pleaded facts are true and draw reasonable inferences in favor of the non-moving party.

*Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). Then, "courts must consider the

complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule

12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by

reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citation omitted). A court "need not take as true the

complaint's legal conclusions" *Dronsejko v. Thornton*, 632 F.3d 658, 666 (10th Cir. 2011). Thus,

to withstand a 12(b)(6) motion to dismiss "a plaintiff must offer specific factual allegations to

support each claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir.

2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

Here, the parties dispute whether Utah or Georgia law should govern. The court easily

concludes that Utah law will govern its discussion of collateral estoppel. *Marrese v. Am. Acad.*

*Of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (noting that 28 U.S.C. § 1738, the Full Faith

and Credit statute, "directs a federal court to refer to the preclusion law of the State in which

judgment was rendered.") As for the remaining issues, the law is not so clear. Thus, the court

will address which state's law applies in the relevant sections below.

## II.    Collateral Estoppel

Defendants argue that Plaintiffs' action is barred by the doctrine of collateral estoppel.

For collateral estoppel to apply, courts conduct a four-part test and must find that:

> (1) The issue decided in the prior adjudication is identical to the one presented in
> the instant action; (2) the party against whom issue preclusion is asserted was a
> party, or in privity with a party, to the prior adjudication; (3) the issue in the first
> action was completely, fully, and fairly litigated; and (4) the first suit resulted in a
> final judgment on the merits.

*Gudmunson v. Del Ozone*, 232 P.3d 1059, 1067 (citation omitted). The parties do not dispute this

standard or the fact that the second prong is satisfied. Thus, the court will only address the first,

third, and fourth prongs of the collateral estoppel test.

### A.  Identical Issues

Plaintiff concedes—at least tacitly—that the Policy's correct level of coverage was an

issue decided during the Default Judgment Action. Plaintiffs argue, however, that there are

additional issues at play in this suit and, therefore, the issues are not identical. Specifically,

Plaintiffs note that they have claimed that Prime acted in bad faith by: (1) failing to respond to

Mr. Jenkins' initial demand; (2) failing to communicate to CLJ that it could contribute its own

funds to bridge the gap between Mr. Jenkins' demand for $100,000 and the funds Prime asserted were available under the Policy; (3) improperly depleting the Liability Limits by spending monies outside the terms of the Policy; and (4) failing to advise CLJ that it could challenge Prime's assertion of the amount of coverage available (these allegations will be collectively referred to as the "Bad Faith" claims, legal theories, or allegations). (Complaint, ECF No. 1-1 at ¶¶ 38, 45–48.)

Under Utah law, courts must "determine whether the issues actually litigated in the first action *are precisely the same* as those raised in the present action." *Schaer v. State By & Through Utah Dep't of Transp.*, 657 P.2d 1337, 1341 (Utah 1983) (citation omitted) (emphasis in original). This means that collateral estoppel "does not apply to issues that merely could have been tried in the prior case, *but operates only to issues which were actually asserted and tried* in the case." *Id.* (citation omitted) (emphasis in original). Thus, the court will focus on what issues were actually presented to the Utah court in the Declaratory Judgment Action.

The Utah court's Default Judgment is quite short and details the issues in the Declaratory Judgment Action. The relevant issues that were "actually asserted and tried"—and then determined—were the following: (1) "Prime has no obligation to defend or indemnify Dr. Dodds and/or CLJ in the Jenkins claim beyond the $50,000 Professional Liability limit applicable to that claim"; (2) "Inasmuch as Prime incurred in excess of $50,000 defending the Jenkins claim . . . it has no obligation to indemnify CLJ or Dr. Dodds for the judgment entered against them in the Jenkins lawsuit." (ECF No. 54-2 at 3.) These two findings are the only possible issues to which collateral estoppel could apply. That means that Plaintiffs' Bad Faith insurance claims cannot be precluded in this litigation because these issues were not asserted and tried before the Utah court.

B.  <u>Fully and Fairly Litigated</u>

"The doctrine of res judicata embraces two distinct theories: claim preclusion and issue preclusion." *Buckner v. Kennard,* 99 P.3d 842, 846 (Utah 2004). A short recitation of the differences between these sister doctrines will help determine whether the issues were fully and fairly litigated in this instance. "[C]laim preclusion bars a party from prosecuting in a subsequent action a *claim* that has been fully litigated previously." *Snyder v. Murray City Corp.*, 73 P.3d 325, 332 (Utah 2003) (emphasis added) (internal quotation marks and citation omitted). Collateral estoppel, on the other hand, "prevents parties or their privies from relitigating *facts and issues* in the second suit that were fully litigated in the first suit." *Buckner*, 99 P.3d at 846 (internal quotation marks omitted) (emphasis added). Because issue preclusion applies to facts and issues, the parties must actually litigate those issues for collateral estoppel to apply. *See Oman v. Davis Sch. Dist.*, 194 P.3d 956, 966 (Utah 2008) (citing to the Restatement (Second) of Judgments § 27 (1982) which states that "an issue of fact or law" must be "*actually litigated and determined*" before that determination is conclusive in a subsequent action. (emphasis added)). The issue thus boils down to the meaning of "actually litigated."

Utah law is not clear on what constitutes "actually litigated." In fact, the clearest pronouncement of the meaning of this phrase presents conflicting definitions. *In State v. Sommerville*, the Utah Court of Appeals stated that "[a]n issue is actually litigated when it is [(1)] properly raised and [(2)] is submitted for determination, and [(3)] is determined." 297 P.3d 665, 675 (Utah 2013) (quotation marks, formatting, and citation omitted). This recitation of what "actually litigated" means would seemingly be satisfied by a default judgment in a declaratory judgment action where the plaintiff properly raises an issue, presents evidence in support of its position, and the court makes a determination based on that evidence. However, in the

*Sommerville* court's next sentence it states that "an issue is not actually litigated where a judgment is entered by confession, consent, or default." *Id.* (citing Restatement (Second) Judgements § 27 cmt. e) (formatting omitted).

Even though the *Sommerville* court is citing the well-respected Restatement (Second) of Judgments for the proposition that "confession, consent, [and] default" do not create issue preclusion, the court is unconvinced that those three categories of judgments are all that similar when it comes to whether an issue is "actually litigated" or that Utah law would favor such a bright-line rule. For example, if a party admits a fact or issue in its answer, the plaintiff would not need to present any evidence on that topic and it would not be litigated at all. Consent can operate the same way; if the parties to a suit stipulate that, say, an element in a multi-pronged test is satisfied, neither party would present evidence on that topic and the issue would not be presented or litigated at all. In some instances, Default can similarly be entered without anything more than the well-pled allegations in a complaint. Default can, however, in other instances, be the product of well-pled allegations in a complaint supported by affidavits, exhibits, testimony, etc. Utah law has, in fact, applied collateral estoppel in the default judgment context—contrary to section 27's language. *See generally Schoney v. Mem'l Estates, Inc.*, 863 P.2d 59 (Utah Ct. App. 1993) (applying issue preclusion following a default judgment entered against the plaintiff in a prior suit in which the plaintiff failed to comply with discovery deadlines); *Peterson v. Armstrong*, 337 P.3d 1058 (Utah Ct. App. 2014) (giving preclusive effect to a prior, ex parte civil stalking injunction case in which the court dismissed the injunction request without a hearing or response from the defendant); *State v. Hamilton*, 70 P.3d 111 (Utah 2007) (noting that Utah statutorily requires that default judgments in quiet title actions be conclusive against all persons named in the complaint and served, whether or not that person appears.)

The application of collateral estoppel is further complicated when analyzing how the Restatement (Second) of Judgments treats declaratory judgments differently than other types of judicial actions. Indeed, by including declaratory judgments in a separate section, the Restatement implies that issue preclusion applies differently in this context. This section of the Restatement states:

> A valid and final judgment in an action brought to declare rights or other legal relations of the parties is conclusive in a subsequent action between them as to the matters declared, and, in accordance with the rules of issue preclusion, as to any issues actually litigated by them and determined in the action.

Restatement (Second) of Judgments § 33 (1982). Although section 33 seems to indicate that a default is not sufficient to preclude an issue, the comments simultaneously suggest that a different analysis should be performed in the context of declaratory judgments. For example, in the claim preclusion context, comment b states:

> If a declaratory judgment is valid and final, it is conclusive, with respect to the matters declared, as to all persons who are bound by the judgment. *This conclusive effect applies even as to a party who makes no appearance in the action*.. . . But, in order to be bound, a person must have been an adversary of the prevailing party with respect to the matter declared.. . .
>
> If a non-appearing party were not concluded as to matters declared by the judgment, a defendant might abort all possible effects of the declaratory action by simply defaulting. On the other hand, the fact that one of the parties does not wish to litigate at a particular stage of a controversy may be a factor mitigating against entertainment of the action, especially where the proceeding involves the consequence of future action as distinguished from a dispute over present interests in property or present status. In any event a court should not make a declaration upon default on the basis of the pleadings alone but should require the plaintiff to present enough evidence to warrant the granting of declaratory relief. Such an examination of the evidence can be regarded as an aspect of the preliminary determination, required by the declaratory relief statutes, that there is a genuine controversy between the parties.. . .
>
> If the court permits a declaratory action to be maintained against a defaulting defendant, the preclusive effect of the judgment with respect to the matters declared may be viewed as a special instance of issue preclusion without adversary contest (compare Comment e, below), or perhaps more appropriately as a limited

> application of the rules of merger and bar in the special context of a declaratory proceeding.

*Id.* at § 33 cmt. b (emphasis added). Comment b is clear that claim preclusion applies to default declaratory judgments. But, this comment is about claim preclusion, not issue preclusion.

Comment *e* discusses issue preclusion in the default declaratory judgment context, noting that issue preclusion "will occur only in accordance with the general rules of issue preclusion, and the exceptions thereto." *Id.* at § 33 cmt. e. Apparently then, issue preclusion would not apply when judgment is entered by default. Comment *e* then backtracks from that statement and notes that the "line between the [claim] preclusion described in comment *b* and the more limited [issue] preclusion [in comment *e*] is *necessarily indistinct.*" *Id.* (emphasis added). Because these res judicata doctrines are "indistinct" the Restatement advises that "it may be useful to regard the preclusive effect of a declaratory judgment rendered on default *as extending only to the ultimate determinations embodied in the declaration itself*, and not to the allegations on which the declarations may rest." *Id.* (emphasis added). Thus, section 33 states—contrary to section 27— that default judgments in the declaratory judgment context may preclude an issue from being relitigated.

This rather lengthy discussion unfortunately only demonstrates that the law on this issue is inconsistent and unclear. The court nevertheless finds that the Restatement (Second) of Judgments § 33 provides enough—although somewhat unclear—legal support to conclude that Plaintiffs are precluded from relitigating the Policy limits and exhaustion thereof. If, however, section 33 is an insufficient basis, the court finds that Utah law would similarly conclude those issues may not be relitigated.

In the past, when Utah's law was unclear on collateral estoppel issues, Utah's courts looked to whether the policy goals of collateral estoppel were met by giving the first lawsuit

preclusive effect. For example, in <u>Gudmundson v. Del Ozone</u>, 232 P.3d 1059, 1067 (Utah 2010), the Utah Supreme Court considered whether a "workers' compensation determination [had] preclusive effect in [the plaintiff's] [subsequent] civil lawsuit against nonemployer third parties." In making this determination, the court first considered the policy underlying issue preclusion before turning to the nature and purpose of workers compensation claims. *Id.* at. 1067–69. The court concluded that "giving preclusive effect to [the plaintiff's] workers' compensation adjudication [did] not promote the purposes of collateral estoppel" and therefore, "decline[d] to adopt a rule that would categorically give preclusive effects to workers' compensation adjudications in civil actions brought by an injured worker against nonemployer third parties." *Id.* at 1069. This same comparison of policy goals and purposes was performed in <u>Buckner v. Kennard</u>, 99 P.3d 842 (Utah 2004) when the Utah Supreme Court examined issue preclusion's application to nonmutual litigations in suits subsequent to arbitration.

Under this framework, the court first notes the purpose of issue preclusion. Under Utah law, "[c]ollateral estoppel serves three primary purposes: (1) preserving the integrity of the judicial system by preventing inconsistent judicial outcomes; (2) promoting judicial economy by preventing previously litigated issues from being relitigated; and (3) protecting litigants from harassment by vexatious litigation." *Gudmundson*, 232 P.3d at 1067. Utah courts also recognize that "[c]ollateral estoppel is not an inflexible, universally applicable principle" and that "it can yield an unjust outcome if applied without reasonable consideration and due care." *Id.* (internal citation and quotation marks omitted). Accordingly, collateral estoppel should not be applied "where its purposes would not be served" or "where it would subvert other legitimate policy considerations." *Id.* (citation omitted). Thus, to perform a correct analysis, the court must also look at the purposes and nature of both declaratory judgment actions and default judgments.

"The purpose of the Declaratory Judgment Act is to permit examination of legal documents and statutes to determine questions of construction or validity arising under such instruments." *Lindon City v. Engineers Const. Co.*, 636 P.2d 1070, 1073 (Utah 1981) (internal quotation marks and footnote omitted). More specifically, declaratory judgments are intended "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and is to be liberally construed and administered." Utah Code § 78B-6-412. As it pertains to contract disputes, a court can entertain a declaratory judgment action "before or after there has been a breach;" Utah Code § 78B-6-409, and an order stemming therefrom "shall have the force and effect of a final judgment or decree." Utah Code § 78B-6-401.

"The purpose of a default judgment is to conclude litigation when a defendant fails to plead or otherwise defend an action. In such circumstances its use is practical and salutary." *McKean v. Mountain View Mem'l Estates., Inc.*, 411 P.2d 129, 130–31 (Utah 1966) (footnote omitted). The policy similarly "recognizes that the diligent party must be protected lest they be faced with interminable delay and continued uncertainty as to their rights." 49 C.J.S. Judgments § 255. "However, while the rules permitting the entry of default judgments are designed to prevent a dilatory defendant from unreasonably thwarting the plaintiff's efforts to establish a claim, they are not intended to provide the plaintiff with a means of gaining a judgment without the difficulties which arise from litigation." *Id.*

With these policy goals in mind, the court must decide whether applying issue preclusion in the default declaratory judgment context serves the purposes of declaratory judgment, default judgment, and collateral estoppel according to the facts of this case. The court finds that collateral estoppel applies *only* to the issue of the liability limits and Policy exhaustion for five reasons.

First, the policy reasons underlying collateral estoppel, default judgment, and declaratory judgments all are intended to promote certainty as to a party's rights. Certainty is a subset of collateral estoppel's policy consideration of promoting judicial economy and was expressly recognized as an important issue preclusion consideration by the Utah Supreme Court. *See Buckner*, 99 P.3d at 850 (noting that "uncertainty" and the "inability to accurately assess and control risk" was an important consideration in the collateral estoppel and arbitration context). By allowing Plaintiffs to now attack the Default Judgment would seriously undermine the purpose of allowing Defendants to present the Utah court with the Policy (before or after breach) and obtain guidance and certainty about their rights and obligations thereunder.

Second, applying issue preclusion to the Default Judgment would serve to prevent inconsistent judicial outcomes. The Utah court already determined that the $50,000 limit applied and that the limit had been exhausted. Although this court does not address the merits of that conclusion, it is plausible that were the court to reconsider the same issue that it could come to a different conclusion. Thus, collateral estoppel's purpose is satisfied by preventing Plaintiffs from relitigating those issues. Additionally, applying issue preclusion to prevent inconsistent judicial outcomes also serves the purpose of declaratory judgments by giving the declaration "the force and effect of a final judgment or decree." Utah Code § 78B-6-401.

Third, the facts of this case are unique and persuade the court that Mr. Jenkins, *as the assignee of CLJ's claims*, should not be permitted to relitigate the Policy limits and exhaustion issues. This is so because Mr. Jenkins is benefitting from CLJ's default—by obtaining a $60,000,000 verdict from an undefended CLJ—while simultaneously trying to undo another of CLJ's default judgments. If the court imagined CLJ's position during these two underlying suits, CLJ would have had a much stronger incentive to defend against the personal injury suit than the

declaratory judgment action—although CLJ had a strong incentive to defend both. *See* Restatement (Second) Judgments § 33 cmt. b (suggesting that courts should consider whether the party might have had an incentive to defend or not defend a certain issue at the time of the first suit). Permitting Mr. Jenkins to argue that CLJ should only be bound by one of two different undefended judgments strikes the court as an unjust outcome. CLJ chose not to defend either action and should be bound by both judgments.

Fourth, because CLJ was served with the complaint and Prime submitted the Policy and other documents to support its motion for summary judgment in the Declaratory Judgment Action, the court feels confident those issues are properly excluded from relitigation in this context. Indeed, Prime presented the Policy's plain language to the Utah court and that court made a determination about the Policy's limit. CLJ knew about these submissions and filings and had the opportunity to respond. CLJ chose not to do so. This is an important fact in determining this issue. Had CLJ not had notice or had Prime not submitted the Policy and other exhibits to the Utah court, it could not be said that the liability limits issue was fully and fairly litigated. In short, the court follows section 33's language stating that the "preclusive effect of a declaratory judgment rendered on default [may] *extend[] only to the ultimate determinations embodied in the declaration itself*, and not to the allegations on which the declarations may rest." Restatement (Second) of Judgments §33 cmt. e (emphasis added). Since the Utah Default Judgment states that the limit was $50,000 and that the limit had been exhausted, those findings are "ultimate determinations embodied in the declaration itself" and may be given preclusive effect. *Id.*

Fifth, not permitting default declaratory judgments to carry issue preclusive effects in some circumstances would undermine the purpose of permitting default judgment in those actions. Indeed, if all that a party had to do to avoid issue preclusion in a declaratory judgment

action was merely fail to appear there would be no incentive for any party to appear and defend in those actions. *See* Restatement (Second) of Judgments § 33 cmt. b. Some preclusive effect must occur to make default judgments effective and the facts of this case persuade the court that applying collateral estoppel is appropriate here.

For the foregoing reasons, the court concludes that only the issues of whether the $50,000 and whether that limit was exhausted are precluded from being relitigated—assuming the last prong is satisfied. Those issues were properly submitted to the Utah court, supported by the Policy and other documents, and the court entered an order on those issues. Thus, these issues were actually litigated under Utah law. This means that Plaintiffs may potentially pursue their Bad Faith claims. Prime did not present those issues to the Utah court and, therefore, they were not fully and fairly litigated.

C.   Judgment on the Merits

Utah law clearly indicates that default judgment is a judgment on the merits. *See Lehi Roller Mills Co. Inc. v. Cal-Agrex, Inc.*, No. 2:06-CV-1001, 2012 WL 13029520 (D. Utah Mar. 20, 2012) (unpublished) ("A default judgment is a final judgment on the merits for purpose of claim preclusion.") (citing *Schoney v. Memorial Estates, Inc.*, 863 P.2d 59, 61 (Utah Ct. App. 1993)). Plaintiffs do not argue that default judgments are considered a judgment on the merits. Instead, Plaintiffs argue that the Default Judgment was not valid because (a) there was no subject matter or (b) personal jurisdiction.

a.   *Subject Matter Jurisdiction*

Plaintiffs argue that there was no subject matter jurisdiction because the issue was not ripe. Specifically, Plaintiffs assert that "[b]y the time it filed the [Declaratory Judgment] action, Prime had already made significant decisions regarding its interpretation of its actions with

regards to the claims submitted against Dodds and CLJ. **By filing the [D]eclaratory [J]udgment [A]ction in a foreign court, Prime clearly sought forgiveness for its chosen course of action, and not guidance from the court.**" (ECF No. 70 at 18 (emphasis in original).) The court is wholly unpersuaded by Plaintiffs' argument.

First, Utah law unequivocally states that in a declaratory judgment action "[a] contract may be construed before or after there has been a breach." Utah Code § 78B-6-409. Thus, the court could have declared the parties' rights and obligations before or after any alleged breach. Second, Plaintiffs' position is illogical. Plaintiffs are bringing a breach of contract claims based on Prime's actions *before* and during the Declaratory Judgment Action. If Prime was in breach of contract at that time, as Plaintiffs allege, then there was certainly a ripe issue for the Utah court to decide. In short, the Utah court's Default Judgment cannot be both an advisory opinion and an instance where a party is allegedly seeking "forgiveness" for its alleged breach of contract.

### b. *Personal Jurisdiction*

Plaintiffs argue that the Utah court did not have personal jurisdiction over CLJ in the Declaratory Judgment Action despite the Policy and supporting documents containing forum selection clauses. Plaintiffs first support this contention by relying on its expert Mr. Windt. Mr. Windt states that the distance between Georgia and Utah was "so gravely difficult and inconvenient to Dr. Dodds/CLJ that, as a practical matter, it deprived Dodds/CLJ of their day in court." (ECF No. 70-10, ¶ 17.) This is not proper evidence for the court to consider in a motion to dismiss because this is beyond the sufficiency of the pleadings. *See Oakwood Vill. LLC v. Albertsons, Inc.*, 104 P.3d 1226, 1231 (Utah 2004) ("Matters outside the pleading include any written or oral evidence which substantiates and does not merely reiterate what is said in the pleadings." (citation and formatting omitted)). Even were the court to consider Mr. Windt's

statement, it is not persuaded that the distance was gravely difficult or inconvenient because: (1) CLJ did not even appear in Georgia so its failure to appear in Utah cannot be said to be due to the geographical distance; and (2) Mr. Windt's statement is unsupported by anything demonstrating why the distance was so "gravely difficult and inconvenient." Thus, this cannot serve as the basis for finding that the Utah court lacked personal jurisdiction in the Declaratory Judgment Action. *See Ventura & Assocs., L.L.C. v. HBH Franchise Co., LLC*, No. 2:11-CV-631, 2012 WL 777270, at *4 (D. Utah Mar. 7, 2012) (rejecting the plaintiff's argument against a forum selection clause because it "put forth no facts to support its contention that litigation in [one state] would be significantly more expensive such that it would essentially deprive [the plaintiff] of its opportunity to pursue its claims against [the defendant]" (collecting cases)).

Plaintiffs' second argument is that the forum selection clauses should not be enforced under Georgia law and Georgia public policy. Plaintiffs are incorrect that Georgia law governs here. Utah law should govern the court's discussion regarding the enforceability of the forum selection clause. The Utah Supreme Court in *State ex rel. W.A.* states that the "proper test" is to first "assess whether *Utah law* confers personal jurisdiction over the nonresident defendant." 63 P.3d 607, 612 (Utah 2002) (emphasis in original). Thus, Utah law governs so long as the forum selection clause is proper. Additionally, the court agrees with Judge Boullee's finding that Plaintiffs' Georgia public interest, fraud, and overreach arguments lack merit. (ECF No. 47 at 21–23.) Accordingly, the court will focus only on whether Utah's law would uphold the forum selection clause.

Under Utah law, a "forum selection/consent-to-jurisdiction clause by itself [is] not sufficient to confer personal jurisdiction over a defendant as a matter of law." *Phone Directories Co. v. Henderson*, 8 P.3d 256, 261 (Utah 2000). Such clauses do, however,

> create a presumption in favor of jurisdiction and will be upheld as fair and
> reasonable so long as there is a rational nexus between the forum selected and/or
> consented to, and either the parties to the contract or the transactions that are the
> subject matter of the contract. Although the rational nexus element does require
> some connection between Utah and either the parties to or the actions contemplated
> by the contract, it need not rise to the level required under [Utah Code § 78B-3-
> 205].

*Id*. In short, these clauses "create[] a rebuttable presumption that the trial court has personal

jurisdiction over" the matter. *Id.* at 262. Plaintiffs have not overcome this presumption and the

court will enforce the clause for two reasons.

First, this "rational nexus" standard is clearly satisfied. Underlying the Declaratory

Judgment Action was CLJ's contract with Prime for professional liability insurance. During the

Policy's period, Prime was located and performed all of its obligations in Utah including issuing,

underwriting, and servicing the policy. Second, the language in the Policy (Policy, ECF No. 4-2

at 23) and Policy Receipt (Policy Receipt, ECF No. 70-10 at 262–63) both unequivocally

indicate that Utah law will govern. Thus, the court finds that the Utah Court had personal

jurisdiction over CLJ during the Declaratory Judgment Action.

## III.   Direct Appeal

Since the court has determined that issue preclusion only applies to the determination of

the Policy limits and exhaustion thereof, Plaintiffs may pursue their Bad Faith claims. Since

these Bad Faith claims are not collateral attacks, this issue is moot.

## IV.   The Policy

Since the court finds that the Policy limits and exhaustion thereof should not be

relitigated, the interpretation of the Policy is also moot and the court declines to address the

merits of the parties' arguments on this topic.

## V.    Stand-Alone Punitive Damages Claim

Defendants argue that Plaintiffs' stand-alone claim for punitive damages must be dismissed because neither Utah nor Georgia law recognizes this as a proper stand-alone cause of action. The court agrees with Defendants. Utah law is clear that "punitive damages are a remedy, not a cause of action." *Allegis Inv. Servs., LLC v. Arthur J. Gallagher & Co*, 371 F. Supp. 3d 983, 999 (D. Utah 2019); *see also Norman v. Arnold*, 57 P.3d 997, 1006 (Utah 2002) (noting that it is inappropriate to plead punitive damages as an independent cause of action). Georgia law similarly states that punitive damages fees are not an independent cause of action. See *Franklin Credit Mgmt. Corp. v. Friedenberg*, 20 S.E.2d 236, 241 (Ga. Ct. App. 2005) (noting that the law does not support perusing punitive damages as an independent cause of action). Thus, the court will dismiss Plaintiffs' Sixth Count but construe the Complaint as praying for and alleging punitive damages as one of the categories of claimed damages.

## VI.    Stand-Alone Attorneys' Fees Claim

Again, the parties dispute whether Utah or Georgia law will govern the claim for attorneys' fees. As noted above, this court concludes that Utah law will govern. That being the case, "Utah adheres to the well-established rule that attorney's fees generally cannot be recovered unless provided for by statute or by contract." *Turtle Mgmt., Inc. v. Haggis Mgmt., Inc.*, 645 P.2d 667, 671 (Utah 1982) (citation omitted). Because there is no contractual attorneys' fees provision here, Plaintiffs must claim they are either statutorily entitled to fees or fall into an exception to this rule. Plaintiffs have not argued or pointed to a Utah statute that would permit attorneys' fees here. Instead, Plaintiffs cite Doctors' Co. v. Drezga, 218 P.3d 598, 608 (Utah 2009) to argue that they fall under an exception to Utah's general rule of only permitting contractual or statutory attorneys' fees.

The *Drezga* court noted that cases "involving insurers who seek a declaration relieving them from liability follow the same logic" that attorneys' fees may be awarded if the non-prevailing party acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 608 (citation and footnote omitted). The *Drezga* opinion, however, does not state whether the claim for attorneys' fees is an independent cause of action or simply a type of damages that must be claimed. The court, nonetheless, believes that because the attorneys' fees in this case could only be awarded under the court's "inherent equitable power[s]" that the cause of action for fees would be improper. *See Steward v. Utah Public Service Comm'n*, 885 P.2d 759, 782 (Utah 1994); *see also 1600 Barberry Lane 8 LLC v. Cottonwood Residential O.P. LP*, — P.3d —, 20201 WL 2150212 (Utah 2021) (citing favorably to Texas law which states that attorneys' fees are a part of a "substantive claim for breach of contract" and therefore "not an independent cause of action." (citing *Midwest Med. Supply Co., LLC v. Wingert*, 317 S.W.3d 530, 537 (Tex. App. 2010))). Thus, the court concludes that the stand-alone claim (Count Seven) for attorneys' fees must be dismissed. The court will, however, construe the cause of action as a prayer for attorneys' fees as a subset of Plaintiffs' claimed damages.

<u>CONCLUSION</u>

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART Defendants' Motion to Dismiss Deferred Causes of Action. (ECF No. 54.) The court GRANTS the motion as to Count Six (punitive damages) and Seven (Attorneys' fees). Punitive damages and attorneys' fees are not stand-alone causes of action in Utah. The court will construe those claims as being prayed for in the complaint. The court DENIES Defendants' motion as to Count Three (breach of contract) and Four (negligence). Plaintiffs may proceed on those claims *only* regarding their Bad Faith legal theories. Whether these Bad Faith claims are legally or factually

viable is a different issue for a later time. Finally, Plaintiffs are precluded from relitigating the applicable policy limit of $50,000 or whether that policy has been exhausted.

DATED this 23d day of August, 2021.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

22