## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| HAL JENKINS, and CLJ HEALTHCARE, LLC,<br><br>   Plaintiffs,<br><br>v.<br><br>PRIME INSURANCE, AND PRIME HOLDINGS INSURANCE SERVICES,<br><br>   Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00130-RJS-DAO<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

Now before the court is Defendants Prime Insurance and Prime Holdings Insurance Services' (collectively, Prime) Motion for Summary Judgment.[1]  For the reasons set forth below, the court GRANTS Defendants' Motion.[2]

### FACTUAL BACKGROUND

This case arises from an insurance settlement dispute following the death of a liposuction patient.  The facts in the Motion are largely undisputed and, insofar as any facts are contested, the court recounts them as CLJ alleges.[3]

On February 19, 2013, April Jenkins died after undergoing a liposuction procedure performed by Dr. Nedra Dodds.[4]  Dodds provided cosmetic surgery though CLJ, d/b/a Opulence

---

[1] Dkt. 168, *Motion for Summary Judgment* (*Motion*).

[2] Hal Jenkins is the assignee of CLJ Healthcare, LLC's claim.  Accordingly, the court refers to Plaintiffs collectively as "CLJ."

[3] *See Campbell v. State Farm Mut. Auto. Ins. Co.*, 840 P.2d 130, 132 (Utah Ct. App. 1992) (recounting the facts as the appellants alleged because "we must view the facts in a light most favorable to the losing party").

[4] Dkt. 173, *Plaintiffs' Response to Defendants' Second Motion for Summary Judgment* (*Response*), at 13.

Aesthetic Medicine, a plastic surgery center in Marietta, Georgia.[5]  At the time of April's surgery, CLJ maintained a liability insurance policy with Prime, containing a $50,000 "professional liability" limit.[6]  When CLJ obtained insurance through Prime, Prime sent CLJ a "binder" that specified a "50,000 Professional Liability" limit, and issued a Certificate of Insurance listing a "per occurrence" limit of $50,000, and an "aggregate" limit of $100,000.[7]  CLJ also had an insurance policy through Owners Insurance Company.[8]

Following April's death, Hal Jenkins, April's father, informed Dodds and CLJ he intended to assert claims.[9]  On April 24, 2013, Jenkins' attorney informed Prime's claims adjuster, David McBride, he was scheduled to speak with the medical examiner and stated, "I think, in good faith, you should tender your limits for a limited release in the next two weeks."[10]  Prime responded that, "depending on what the Examiner found, Prime would be happy to consider any reasonable demand for settlement."[11]  On August 5, 2013, prior to receiving the medical examiner's report, Jenkins filed a complaint against Dodds and CLJ in Cobb County, Georgia.[12]

On August 6, 2013, McBride contacted Jenkins' counsel and asked "if he would be amenable to a settlement discussion before Prime retain[ed] defense counsel,"[13] explaining "the

---

[5] *Motion* ¶ 1; *Response*, at 2.

[6] *Response* at 2.  CLJ obtained its Prime policy through a "surplus lines insurance broker," Evolution Brokers.  *Id.* ¶¶ 11–12.

[7] *Motion* ¶ 2; *Response* at 4.

[8] *Motion* at p. 9.

[9] *Motion* ¶ 8; *Complaint* ¶ 2.

[10] *Motion* ¶¶ 11–12; *Response* ¶ 6.

[11] *Motion* ¶ 14 (internal quotation marks omitted); *Response* at 6.

[12] *Motion* ¶¶ 16–17; *Response* at 4; Dkt. 114-10, *Georgia Complaint*.

[13] *Motion* ¶ 18 (internal quotation marks omitted); *Response* at 4.

policy limits decrease by expenses incurred in defending the lawsuit."[14]  Soon thereafter, Jenkins' counsel informed McBride that Jenkins would not settle for the $50,000 limit.[15]  On August 22, 2013, Prime sent Jenkins' counsel and CLJ a letter tendering $50,000 to Jenkins.[16]  The letter stated, "The limit of professional liability on the Policy is fifty thousand dollars ($50,000.00) with a Policy aggregate of one hundred thousand dollars ($100,000.00).  This limit decreases by expenses incurred in investigating and defending the Insured."[17]  The letter further stated:

> At this time [Prime] is tendering the entire fifty thousand dollars ($50,000.00) limit to your Client as full and final settlement of your Client's claims.  Should your Client reject this offer, please be aware that [Prime] will retain defense counsel to represent the Insured and Dodds and that the expenses incurred in investigating and defending the Insured and Dodds will begin to decrease the limit.  The limit may even wholly erode prior to the conclusion of litigation.[18]

Prime encouraged CLJ to retain an attorney for advice on how to "proceed with defense or to attempt settlement and on what terms."[19]  Jenkins rejected Prime's $50,000 tender.[20]

Prime sent another letter to CLJ on November 4, 2013 confirming the rejection and reminding CLJ "the limit will be depleted by any costs incurred in [the] defense."[21]  Prime stated it would pay for the defense until the $50,000 limit was exhausted or, alternatively, Prime was "willing to tender to [CLJ] the entire remaining amount at this time for [CLJ's] use as [CLJ]

---

[14] *Motion* ¶ 18; *Response* at 4.

[15] *Motion* ¶ 19; *Response* at 7.

[16] *Motion* ¶ 20; *Response* at 7 ("This contention is not in dispute.").

[17] Dkt. 114-12; *August 22, 2013 Letter*.

[18] *Id.*

[19] *Motion* ¶ 25; *Response* at 4.

[20] *Motion* ¶ 29; *Response* at 8.

[21] *Motion* ¶¶ 29–30; *Response* at 4, 8.

see[s] fit in the defense or settlement of this claim."[22]  Prime again advised CLJ to consult with counsel.[23]

The claim proceeded and Prime provided copies of at least some of the defense attorneys' invoices to CLJ.[24]  By April 8, 2014, Prime calculated it had incurred $10,243.93 in attorney fees.[25]  On April 15, 2014, Jenkins sent a letter to Prime and CLJ proposing settlement for $2.1 million, "$2,000,000 from Owners Insurance Company" and $100,000 from Prime.[26]  The settlement offer was contingent on Prime "tendering its available limits of $100,000" and expired on May 12, 2014.[27]  CLJ and Dodds acknowledged receipt of Jenkins' demand letter.[28]  Dodds later testified that, though she received the April 2014 demand letter, she "never understood" that the policy limit was $50,000.[29]  Rather, Dodds thought the $50,000 was for defending the claim, and $100,000 was "the pool for what you do [with] the settlement."[30]  Dodds further testified Prime's former communications regarding the $50,000 limit had not changed her belief the policy limit was $100,000 and, had she "had a full understanding that it was really 50 . . . then [she] could have sold a piece of equipment or . . . [acquired] a loan to make the difference."[31]

---

[22] *Motion* ¶¶ 31–32; *Response* at 4 ("Plaintiffs do not dispute Defendants Statements of fact Numbers . . . 30–33.").

[23] *Motion* ¶ 33.

[24] *Motion* ¶ 34; *Response* at 9 ("Dr. Dodds' testimony was equivocal as to whether she received all invoices from Prime.").

[25] *Motion* ¶ 35; *Response* at 9.

[26] *Motion* ¶¶ 36–37.

[27] *Motion* ¶ 37; *Response* at 4.

[28] *Motion* ¶ 38; Dkt. 115-15 at 126–27.

[29] Dkt. 115-15 at 127–28.

[30] *Id.* at 128.

[31] *Id.* at 126–28.

When questioned why she did not pursue a loan, Dodds responded that no one ever asked her if she "could do the balance."[32]

Two days after receiving Jenkins' demand letter, Prime responded that its "full policy limit had been $50,000, not $100,000," and reminded Jenkins he had previously rejected Prime's tender of the $50,000, which had since been "depleted" due to defense costs.[33]  Prime further informed Jenkins it was "willing to pay its remaining limits for a mutually agreeable settlement and release as mentioned in [Jenkins'] letter and hereby re-tenders" the remaining limit "estimated to be $39.000."[34]  Owners Insurance did not respond to Jenkins' demand letter until it denied coverage in September 2014.[35]

After the insurance companies did not meet Jenkins' settlement deadline, the case proceeded to trial and resulted in a $60 million judgment.[36]

## PROCEDURAL HISTORY

All parties have variously litigated matters relating to April's death and the ensuing insurance disputes in a variety of courts for over a decade.  The court summarizes the relevant history in brief.

### A.  Jenkins' Georgia Case.

Jenkins filed suit in Georgia on August 6, 2013, asserting three claims: 1) Professional Negligence against Dodds; 2) *Respondeat Superior* against Opulence Aesthetic Medicine; and 3)

---

[32] *Id*.

[33] *Motion* ¶¶ 42–44; *Response* at 10.

[34] *Motion* ¶ 45; *Response* at 10.

[35] *Motion* ¶ 46; *Response* at 4.

[36] *Complaint* ¶¶ 57–58; *Motion* ¶¶ 51–52; *Response* at 11–12.  Jenkins moved to dismiss Dodds from the case prior to trial.  *Motion* ¶ 50; *Response* at 11.

*Respondeat Superior* against CLJ.[37]  As recounted above, Prime initially defended CLJ, but in the process depleted the available policy limit, causing it to stop defending CLJ in June 2014.[38] The case went to trial in mid-December 2018, resulting in a $60 million verdict against the then-undefended CLJ.[39]

### B.  Prime's Utah Case.

While the Jenkins case in Georgia was pending, Prime filed for declaratory relief in Utah.[40]  Prime sought a declaration stating it had no obligation to defend CLJ against Jenkins' claim beyond the $50,000 Professional Liability limit and requested permission to cease defending CLJ.[41]  On March 19, 2019, the Utah State Court entered an order granting default judgment for Prime.[42]  The Court declared Prime had no obligation to defend CLJ beyond the $50,000 limit, Prime had no obligation to CLJ when the $100,000 aggregate limit was exhausted, and Prime had no further obligation to indemnify or defend CLJ or Dodds in the Jenkins case because Prime had already incurred more than $100,000 in fees defending CLJ for two different claims.[43]  Prime subsequently procured an order domesticating its declaratory judgment in Georgia on June 3, 2019.[44]

---

[37] *See* Dkt. 4-4, *Jenkins' Complaint in the State Court of Cobb County, State of Georgia*.

[38] *Motion* ¶¶ 47, 49; *Response* at 10–11.

[39] *Motion* ¶ 51.  Jenkins moved to dismiss Dodds from the case prior to trial. *Id.* ¶ 50; *Response* at 11.

[40] Dkt. 4-6, *Complaint for Declaratory Relief*.

[41] Dkt. 4-6, *Utah Declaratory Judgment Complaint*.

[42] Dkt. 109-6, *Order Granting Plaintiff's Motion for Default Judgment* (*Default Judgment*).

[43] *See id.*  While defending Dodds and CLJ for the Jenkins claim, Prime was also defending Dodds and CLJ for another claim by a different party.

[44] Dkt. 4-7, *Order to Domesticate Foreign Judgment Against Defendants Nedra Dodds, M.D. and CLJ Healthcare, LLC d/b/a Opulence Aesthetic Medicine*.

### C. CLJ's Georgia Case.

On March 10, 2020, CLJ filed a complaint in Cobb County Georgia against Prime asserting seven claims: 1) Legal Malpractice as to David McBride and Prime; 2) Breach of Fiduciary Duty as to David McBride and Prime; 3) Breach of Contract as to Prime; 4) Negligence as to Prime; 5) Unauthorized Sale of Surplus Lines Insurance as to Prime and Evolution Brokers; 6) Claim for Punitive Damages as to all Defendants; and 7) Claim for Attorney Fees as to all Defendants.[45] Prime filed a motion to dismiss or, in the alternative, transfer the case to this court. On March 3, 2021, the Georgia court granted Prime's motion as to the claims for malpractice, breach of fiduciary duty, and the unauthorized sale of surplus lines insurance.[46] The Court transferred the remaining claims to this court.[47]

### D. CLJ's District of Utah Case.

After the case was transferred to this court, Prime filed a motion to dismiss the remaining claims.[48] In this Motion, Prime argued the breach of contract and negligence claims should be dismissed because they were based on a policy limit of $100,000, and yet the Declaratory Judgment it obtained in Utah determined the policy limit was $50,000; accordingly, Prime argued CLJ was collaterally estopped from challenging that Judgment.[49] Prime also argued CLJ had no legal basis to seek punitive damages or attorney fees.[50] Judge Dale A. Kimball

---

[45] Dkt. 1-1, *Complaint*.

[46] Dkt. 47, *Order Granting Defendants' Motion to Dismiss with Respect to Counts One, Two, and Five of Complaint*.

[47] *Id.*

[48] Dkt. 54, *Defendants' Motion to Dismiss Deferred Causes of Action* (*Motion to Dismiss*).

[49] *Motion to Dismiss* at 10–14.

[50] *Id.* at 17–18.

subsequently granted Prime's Motion as to the punitive damages and attorney fees claims, but permitted CLJ to proceed on the breach of contract and negligence claims.[51]

The parties proceeded with discovery and Prime filed a motion for summary judgment on December 6, 2022.[52]  In its Motion for Summary Judgment, Prime again argued CLJ could not establish a breach of contract because the court was bound by the Utah Declaratory Judgment.[53] Regarding the negligence claim, Prime argued Utah does not recognize a negligence claim in the context of handling settlement claims.[54]  Prime further argued the claim would fail even if the court were to construe it as a breach of the duty of good faith and fair dealing claim (bad-faith claim) because it was time-barred and there was no underlying breach of contract.[55]  Judge Kimball agreed the Declaratory Judgment estopped CLJ from asserting the breach of contract claim and the negligence claim was time-barred.[56]  Judge Kimball dismissed the case, and CLJ appealed.[57]

### E.  The Appeal.

The Tenth Circuit Court of Appeals reviewed three issues on appeal: 1) the effect of the declaratory judgment on CLJ's contract claim; 2) the timeliness of CLJ's bad-faith claim as to Prime; and 3) and the timeliness of CLJ's bad-faith claim as to McBride.[58]  The Tenth Circuit

---

[51] Dkt. 85, *Memorandum Decision and Order on Motion to Dismiss*.

[52] Dkt. 109, *Defendants' Motion for Summary Judgment* (*First Motion for Summary Judgment*).

[53] *First Motion for Summary Judgment* at 10–11.

[54] *Id.* at 12–13.

[55] *Id.* at 13–21.

[56] Dkt. 139, *Memorandum Decision and Order on Motion for Summary Judgment* (*Summary Judgment Order*), at 7–15; Dkt. 140, *Judgment*.

[57] *See* Dkt. 144, *Notice of Appeal as to Order on Motion for Summary Judgment*.

[58] *Jenkins v. Prime Ins. Co.*, No. 23-4113, 2024 WL 4040386 (10th Cir. 2024).  CLJ also raised a question regarding the availability of a cause of action for the unauthorized sale of insurance under a Utah statute.  The Tenth Circuit concluded CLJ failed to preserve this issue and did not address it.  *See id.* at *1.

upheld Judge Kimball's decision that the declaratory judgment precluded CLJ's breach of contract claim because the "judgment prevent[ed] relitigation of the amount of the policy limit" and "CLJ base[d] its contract claim on a challenge to the policy limit."[59]  The Court also upheld the dismissal of CLJ's bad-faith claim against McBride.[60]

However, the Court reversed Judge Kimball's decision on the bad-faith claim as to Prime because the claim was timely under the appropriate accrual rules.[61]  Central to the Tenth Circuit's analysis was distinguishing between third-party contractual bad-faith claims and bad-faith claims based in tort.  It stated that if CLJ's bad-faith claim was grounded in allegations of Prime's wrongdoing before Jenkins filed suit, the claim would be contractual.[62]  Conversely, "[i]f the wrongdoing came after the third party had sued, the bad-faith claim would rest on tort principles."[63]  The distinction was critical to the timeliness issue because if the bad-faith claim was contractual it would have been ripe by 2014 when Prime allegedly breached its contract in its preliminary discussions with Jenkins.[64]  However, third-party, tort-based bad-faith claims do not accrue until "the excess judgment becomes final and non-appealable."[65]

The Tenth Circuit determined CLJ's bad-faith claim was tort-based and grounded in two post-suit "acts or omissions": 1) Prime failed to tell CLJ how much coverage was available; and 2) Jenkins demanded $100,000 in settlement, but Prime counter-offered for less without telling CLJ that it could contribute to the settlement.  Because the $60 million excess judgment for

---

[59] *Id.* at *6.

[60] *Id.* at *9.  The Court affirmed Judge Kimball's dismissal of the claims against McBride as time-barred.

[61] *Id.* at *6–8.

[62] *Id*.

[63] *Id.* at *6.

[64] *Id.* at *8.

[65] *Id.* at *7.

Jenkins became final with the jury verdict in 2018 and CLJ filed its claims in March 2020, the

Court concluded CLJ's claim was not time-barred.[66]  Accordingly, the Tenth Circuit remanded

the case to address the merits of CLJ's bad-faith claim.  Prime filed the present Motion on this

sole remaining claim on January 28, 2025.  The motion is fully briefed[67] and the court heard oral

argument on April 15, 2025.[68]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when "there

is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a

matter of law."[69]  A fact is material if, under the governing substantive law, it " might affect the

outcome of the suit."[70]  When a party submits a supported motion for summary judgment, "the

adverse party must set forth specific facts showing that there is a genuine issue for trial."[71]  The

court then "determine[es] whether there is a need for a trial—whether, in other words, there are

any genuine factual issues that properly can be resolved only by a finder of fact because they

may reasonably be resolved in favor of either party."[72]  In performing this threshold inquiry, the

court "view[s] the evidence and make all reasonable inferences in the light most favorable to the

nonmoving party."[73]

---

[66] *Id.* at *8.  The statute of limitations for the claim is four years.  *See id.*

[67] Dkt. 173, *Response*; Dkt. 178, *Reply Supporting Motion for Summary Judgment* (*Reply*).

[68] Dkt. 181.

[69] Fed. R. Civ. P. 56(a).

[70] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[71] *Id*. at 250.

[72] *Id*.

[73] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## ANALYSIS

The only issue before the court on remand is whether Prime is entitled to summary judgment on CLJ's tort-based, bad-faith claim.[74]  The parties dispute what law applies and what facts the court may consider in its analysis.  On the merits, Prime contends CLJ cannot prevail on its bad-faith claim because it misstates the duty of good faith and fair dealing and cannot show a breach of the duty or causation.[75]  The court first addresses the threshold choice-of-law and evidentiary issues and then ultimately concludes CLJ cannot show Prime breached its duty of good faith and fair dealing.[76]

### I.    Choice of Law

Prime agues "Utah law applies to the remaining tort claim because it falls within the insurance policy's choice-of-law provision."[77]  Though CLJ does not explicitly state Georgia law should apply, it contends "there is a strong argument for application of Georgia substantive law," and relies on some Georgia cases in its Opposition.[78]

A choice-of-law problem arises "whenever a contract has a substantial relationship in two or more states with different local law rules on the subject."[79]  "In making choice of law

---

[74] *See Jenkins*, 2024 WL 4040386, at *9; *Response* at 19.

[75] *Motion* at 3–5.

[76] Accordingly, the court declines to reach the issue of causation.

[77] *Motion* at 11.

[78] *Opposition* at 21–25, 32–33, 35, 39, 40–41.

[79] *Morris v. Health Net of California, Inc.*, 988 P.2d 940, 941 (Utah 1999) (internal citations omitted).  It is unclear whether CLJ is asserting a conflict between Utah and Georgia law.  For example, CLJ contends "Georgia law expressly states that a duty to settle 'arises when the injured party presents a valid offer to settle within the insured's policy limits.'"  *Response* at 32 (*quoting First Acceptance Ins. Co. of Ga. v. Hughes*, 305 GA 489, 492 (2019)).  But CLJ also states Utah law and Georgia law are consistent.  *See e.g.*, *Response* at 21 ("[A]s Utah would characterize this case as a claim sounding in tort, both presuit conduct and postsuit conduct are relevant and actionable under the tort theory."); *id*. ("Consistent with Utah law, Georgia characterizes negligent or bad faith failure to settle as a tort."); *Id.* at 32 ("Consistent with Utah law, Georgia characterizes negligent or bad faith failure to settle as a tort.").  Additionally, CLJ argues its bad-faith claim under both Utah and Georgia law.  *See Response* at 22–41.  However, CLJ appears to urge the court to apply Georgia law in determining when Prime's duty to settle arose, so the court addresses the issue.

determinations, a federal court sitting in diversity must apply the choice of law provisions of the forum state in which it is sitting."[80]  In Utah, a contract forum selection may be "sufficiently broad to cover . . . tort claims."[81]  For example, in *Energy Claims Limited v. Catalyst Investment Group Limited* the Utah Supreme Court concluded a clause "govern[ing] 'any dispute, controversy or claim' that is 'related to' the parties' contract" encompassed tort claims because "the use of the term 'any' does not support a distinction between contract claims and tort claims."[82]

Here, CLJ's insurance policy contains a forum selection clause that states "any rights, remedies, or obligations provided for in [the policy] shall be construed and enforced in accordance with the laws of Utah."[83]  Like *Energy Claims*, the parties' contract does not distinguish between contract and tort claims in its forum selection clause.  Accordingly, the court concludes Utah law applies.

## II.    The Court May Only Consider Post-Suit Facts.

The parties also dispute whether the Tenth Circuit's ruling precludes the court from considering Prime's conduct before Jenkins filed his Complaint.[84]  The Tenth Circuit limited CLJ's tort-based claim to post-suit facts,[85] but CLJ argues the Tenth Circuit's decision does not prohibit this court from considering Prime's pre-suit conduct because the Tenth Circuit "did not evaluate whether Prime could be liable for its pre-suit refusal to meet Jenkins' time limited

---

[80] *Rocky Mountain Helicopters, Inc. v. Bell Hellicopter Textron, Inc.*, 24 F.3d 125, 128 (10th Cir. 1994).

[81] *Energy Claims Ltd. v. Catalyst Inv. Grp. Ltd.*, 325 P.3d 70, 82 (Utah 2012).

[82] *Id.*

[83] *Motion* at 20; *see also Response* at 21 (declining to dispute the contract contains this provision).

[84] *Response* at 19.

[85] *Jenkins*, 2024 WL 4040386, at *6 (identifying two post-suit "acts or omissions" as the basis for CLJ's tort-based bad-faith claim).

demand."[86]  In other words, concluding a tort-based bad-faith claim accrues upon entry of judgment "[does] not eliminate pre-suit conduct as a basis for tort liability."[87]

CLJ is correct that the Tenth Circuit's analysis of CLJ's bad-faith claim focused primarily on whether it was barred by the statute of limitations.  It concluded a third-party, tort-based bad-faith claim for failure to settle begins to accrue "when the excess judgment becomes final and non-appealable" and CLJ's bad-faith claim was therefore timely.[88]  However, as stated above, this conclusion turned on a distinction in timing between contract-based and tort-based bad-faith claims.[89]  Relying on *Black v. Allstate Insurance Company*,[90] the Tenth Circuit observed that under Utah law contractual bad-faith claims stem from the insurer's alleged misconduct prior to the filing of a lawsuit and misconduct after a third party filed a complaint is tort-based.[91]  If CLJ's bad-faith claim was contractual, the breach would have occurred no later than 2014 when Prime allegedly breached its contract in its preliminary discussions with Jenkins.[92]  Only the post-suit conduct supported the tort-based bad-faith claim that did not accrue until the judgment became final.[93]  The parties agree CLJ's claim is tort-based.[94]  However, CLJ attempts to distinguish *Black* and urges the court to evaluate "the entire relationship between Prime and CLJ, including events which occurred prior to the initiation of the underlying suit."[95]

---

[86] *Id.*

[87] *Id.* at 20.

[88] *Jenkins*, 2024 WL 4040386, at *6–8.

[89] *Id.* at *6.

[90] *Black v. Allstate Ins. Co.*, 2004 UT 66, 100 P.3d 1163 (Utah 2004).

[91] *Jenkins*, 2024 WL 4040386, at *6.

[92] *Id.* at *8.

[93] *Id.* at *7.

[94] *Response* at 19.

[95] *Id.*

In *Black*, the Utah Supreme Court stated pre-suit conduct is "contractual rather than fiduciary" because "an insurer's 'duty to defend' does not arise until a formal lawsuit has been commenced against the insured."[96]  While recognizing "much of the negotiation and settlement of claims occurs prior to the filing of a formal complaint," the *Black* Court reasoned an insurer's pre-litigation duty is not fiduciary in nature because "the insured has not yet relinquished any right to negotiate on his own behalf" and "has not yet been exposed to a judgment and personal liability in excess of the policy limits."[97]  CLJ argues "*Black* involved none of the hallmarks of this case or of traditional bad faith 'refusal to settle' claims."[98]  Specifically, unlike the insured in *Black*, CLJ did not have the ability to negotiate its own claim prior to litigation.[99]  Prime had the "exclusive ability to settle claims" against CLJ such that CLJ was "in the same position as an insured after the initiation of formal proceedings."[100]

Prime argues the court "should follow the Tenth Circuit's determinations concerning the character and scope of CLJ's" bad-faith claim under the "law-of-the-case doctrine and mandate rule."[101]  Prime contends the Tenth Circuit already rejected CLJ's argument that Prime's fiduciary duty encompassed its pre-suit conduct and identified only post-suit conduct for CLJ's bad-faith claim.[102]  The court agrees with Prime.

---

[96] *Black*, 100 P.3d at 1170.

[97] *Id.*

[98] *Response* at 28.

[99] *Id.*

[100] *Id.*; *see also id.* at 31 ("[T]he rationale cited by the *Black* case for finding that the fiduciary duty does not arise until initiation of formal litigation does not exist in this case.  Here, CLJ had actually relinquished its rights to negotiate on its own behalf to Prime, giving rise to Prime's fiduciary duty, not a mere contractual obligation.").

[101] Dkt. 178, *Reply Supporting Motion for Summary Judgment* (*Reply*), at 4; *see also*, *Motion* at 14–19.

[102] *Motion* at 17.

"The law of the case 'doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"[103] Under the law of the case doctrine, a district court has discretion to reconsider prior decisions it has made prior to an appeal.[104] However, if an issue has been decided by an appellate court, the district court is bound to "honor the mandate of the appellate court" on remand.[105] "This court may not substitute its own view for that of the appellate court,"[106] and "must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces."[107]

An appellate court may decide an issue "either explicitly or by necessary implication."[108] The Tenth Circuit has stated an issue has been implicitly resolved in a prior appeal if:

> (1) resolution of the issue was a necessary step in resolving the earlier appeal; (2) resolution of the issue would abrogate the prior decision and so must have been considered in the prior appeal; and (3) the issue is so closely related to the earlier appeal its resolution involves no additional consideration and so might have been resolved but unstated.[109]

---

[103] *Bay v. Anadarko E&P Onshore LLC*, 73 F.4th 1207, 1216 (10th Cir. 2023) (*quoting United States v. Monsisvais*, 946 F.2d 114, 115 (10th Cir. 1991)); *see also Wessel v. City of Albuquerque*, 463 F.3d 1138, 1143 (10th Cir. 2006) ("Generally, once a court decides an issue, the same issue may not be relitigated in subsequent proceedings in the same case.") (internal quotation marks and citation omitted).

[104] *IHC Health Services, Inc. v. D&K Management, Inc.*, 2008 UT 73, ¶ 28, 196 P.3d 588.

[105] *Id.*; *see also Ute Indian Tribe v. State of Utah*, 935 F. Supp. 1473, 1518–19 (D. Utah 1996) (stating the critical difference between an appellate court and a district court with the effect of an appellate decision is that "what may may be deemed *reconsideration* of an earlier ruling–'changing our views'–at the [appellate] level may well be deemed *noncompliance* if undertaken at the district court level. The difference is one of power.") (emphasis in the original).

[106] *Ute Indian Tribe*, 935 F. Supp. at 1523.

[107] *Utah Dept. of Transp. v. Ivers*, 218 P.3d 583 at 587 (Utah 2009) (internal citation omitted).

[108] *Id*.

[109] *Guidry v. Sheet Metal Workers Intern. Ass'n, Local No. 9*, 10 F.3d 700, 707 (10th Cir. 1993).

Here, as part of its statute of limitations analysis, the appellate court implicitly narrowed the scope of CLJ's tort-based, bad-faith claim to post-suit facts. CLJ's appellate brief makes the same fiduciary argument it does here, namely, distinguishing *Black* by contending "Prime assumed control of the Jenkins' claim well before the suit was filed."[110] The Tenth Circuit implicitly rejected that argument in limiting a tort-based, bad-faith claim to "wrongdoing [that] came after the third party had sued" notwithstanding CLJ's attempt to distinguish *Black* in the same way it does here.[111] The Tenth Circuit confined the basis of CLJ's bad-faith, tort-based claim to two post-suit "acts or omissions" and explicitly declined to allow pre-suit conduct to factor into the analysis.

Furthermore, CLJ does not address the *Black* Court's additional rationale for concluding a third-party tort-based claim does not accrue until a lawsuit has been filed: that an insured is only "exposed to a judgment and personal liability in excess of the policy limits" after a suit against them commences.[112] The court thus concludes it is limited to considering only Prime's conduct after Jenkins filed his Complaint.

### III.    Prime Did Not Breach Its Fiduciary Duty.

Plaintiffs' sole remaining claim against Prime is their tort-based, bad-faith claim. In the third-party context, a bad-faith claim is "properly regarded as a separate cause of action for a wrong done to the insured by violating a fiduciary duty owed" to the insured.[113] The elements for a breach of fiduciary duty claim are: "(1) a duty of reasonable care owed by the defendant to

---

[110] Dkt. 174-1, *Brief of Appellants filed in the 10ᵗʰ Circuit of U.S. Court of Appeals; Appellate Case: 23-4113*; *see also id.* at 40–46 (distinguishing *Black* and arguing Prime's pre-litigation conduct is properly characterized as tort).

[111] *Jenkins*, 2024 WL 4040386, at *6.

[112] *Black*, 100 P.3d at 1170 (internal alterations and citation omitted).

[113] *Ammerman v. Farmers Ins. Exch.*, 430 P.2d 576, 579 (Utah 1967).

plaintiff; (2) a breach of that duty; (3) the causation, both actually and proximately, of injury; and
(4) the suffering of damages by the plaintiff."[114]

The nature of Prime's duty of reasonable care as a fiduciary to CLJ was to "act in good
faith and be as zealous in protecting the interests of [CLJ] as it would in looking after its
own."[115]  Acting in good faith includes the obligations to "act promptly and reasonably in
accepting or rejecting" claims, "defend the insured," diligently investigate claims, and fairly and
reasonably evaluate and settle claims against the insured.[116]  The duty "also requires an insurer to
'deal with laymen as laymen and not as experts in the subtleties of law and underwriting' and to
refrain from actions that will injure the insured's ability to obtain the benefits of the contract."[117]
"The test of the insurer's conduct is one of reasonableness."[118]

The parties do not dispute that Prime owed a duty of good faith to CLJ.[119]  However, the
parties disagree as to whether Prime's conduct constituted a breach of that duty.  CLJ alleges
Prime breached its duty in two ways: 1) Prime failed to tell CLJ how much coverage was
available; and 2) Jenkins demanded $100,000 in settlement, but Prime counter-offered for less
without telling CLJ that it could contribute to the settlement.[120]  On the other hand, Prime
contends CLJ's arguments impose obligations on insurers beyond the scope of the duty of good

---

[114] *Gables at Sterling Village Homeowners Assoc., Inc. v. Castlewood-Sterling Village I, LLC*, 417 P.3d 95, 110
(Utah 2018).

[115] *UMIA Ins., Inc. v. Saltz*, 515 P.3d 406, 416 (Utah 2022) (internal quotation marks and citation omitted).

[116] *Id.* at 417; *see also Blakely v. USAA Cas. Ins. Co.*, 691 F. App'x 526, 532 (10th Cir. 2017) ("Utah courts have
stated that an insurer's implied obligation of good faith performance contemplates, at the very least, that the insurer
will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim,
and will thereafter act promptly and reasonably in rejecting or settling the claim.") (internal quotations marks and
citations omitted).

[117] *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985).

[118] *Campbell v. State Farm Mut. Auto. Ins. Co.*, 840 P.2d 130, 139 (Utah Ct. App. 1992).

[119] *See generally*, *Motion, Opposition*.

[120] *Jenkins*, 2024 WL 4040386, at *6.

faith and fair dealing, and CLJ cannot show a breach of the duty as properly defined.[121]  The court agrees.

### A. Prime Did Not Breach its Duty in Communicating the Available Coverage.

CLJ first argues Prime breached its duty by failing to communicate how much coverage was available.[122]  Specifically, CLJ contends Dodds "did not understand the concept of diminishing limits or that CLJ only had $50,000 to work with in defending" against Jenkins' claim, and Prime "had a duty to keep CLJ advised."[123]  CLJ states Dodds "was naive as to the matters of insurance," and believed McBride was her "attorney and acting as a risk manager to guide her through the claims process."[124]  Prime contends there is no "affirmative duty to volunteer an explanation of the eroding policy limit beyond what was plainly described in the insurance policy" and that, in any event, Prime did explain the depleting limit.[125]  The court concludes CLJ's argument fails for three reasons: 1) CLJ misconstrues Prime's good-faith duty; 2) CLJ's Response relies on pre-suit facts; 3) and the evidence before the court demonstrates Prime did communicate with CLJ regarding the policy limits.

First, CLJ argues "Prime absolutely had a duty to keep CLJ advised" of "the concept of diminishing limits" and "that CLJ only had $50,000 to work with in defending the claim."[126]  CLJ relies on the *Beck v. Farmers Insurance Exchange* rule that insurers must "deal with laymen as laymen and not as experts in the subtleties of law and underwriting."[127]  CLJ appears to argue

---

[121] *Motion* at 24–25, 28–31.

[122] *Jenkins*, 2024 WL 4040386, at *6.; *Response* at 33–36.

[123] *Response* at 33.

[124] *Id.* (quotation marks omitted).

[125] *Motion* at 24–25.

[126] *Opposition* at 33.

[127] *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985).

that "deal[ing] with laymen as laymen" includes a duty for Prime to advise CLJ and ensure Dodds sufficiently understood the Policy. CLJ has not identified, and the court has not found, any case law imposing such a duty. To the contrary, under Utah law, "each party has the burden to read and understand the terms of a contract before he or she affixes his or her signature to it . . . [P]arties are not permitted to show that they did not know a contract's terms, and in the absence of fraud or mistake they will be bound by all of its provisions, even if they have not read the agreement and do not know its contents."[128]

Additionally, in arguing Prime had a duty to keep CLJ informed, CLJ points to only pre-suit conduct. CLJ states "Dodds was not advised that Jenkins had made a settlement demand for policy limits in April 2013," and she would have "absolutely approved" the settlement had she been "kept in the loop."[129] CLJ further complains that "[d]espite the wealth of information Prime had in its possession since April, Prime waited until August of 2013, after suit was filed and CLJ was served, to obtain permission from the claims committee to offer the $50,000 limits."[130] Even if Prime had an obligation to affirmatively advise Dodds,[131] the conduct CLJ complains of all occurred before Jenkins filed suit in August 2013.[132] And as explained above, the court is constrained to consider only Prime's conduct after Jenkins filed his complaint.

Furthermore, the uncontroverted evidence before the court demonstrates Prime properly communicated the diminishing policy limits to CLJ. CLJ's Certificate of Liability Insurance lists

---

[128] *McCleve Prop., LLC v. D. Ray Hult Family Ltd. P'ship*, 307 P.3d 650, 655 (Utah Ct. App. 2013) (internal quotation marks, alterations, and citations omitted).

[129] *Id.* at 34.

[130] *Id.* at 35.

[131] CLJ does not cite any authority to support any affirmative duty, and the court is not aware of any.

[132] *See Response* ¶¶ 8–12, 21–25.

a "50,000" limit for "each occurrence" and a general aggregate limit of "$100,000."[133]  Prime sent the policy to Dodds with an email that included the following language: "We would like to point out some important information regarding your insurance policy . . .  All claim expenses reduce the available limits of liability outlined under the insurance policy."[134]  And shortly after the Jenkins lawsuit was filed on August 5, 2013, Prime sent a letter to Jenkins' counsel and CLJ tendering the policy limit on August 22, 2013, and reminding counsel and CLJ the policy limit was $50,000 and "expenses incurred in investigating and defending [CLJ] and Dodds will begin to decrease the limit."[135]  It also advised Dodds to obtain counsel.[136]  Prime sent another letter to CLJ on November 4, 2013 reminding CLJ the $50,000 limit "will be depleted by any costs incurred in [the] defense."[137]  Prime stated it would pay for the defense until the $50,000 limit was exhausted or alternatively that Prime was "willing to tender to [CLJ] the entire remaining amount" at that time for CLJ to use as it saw fit in handling the claim.[138]  Prime further kept Dodds apprised of the diminishing policy limit with invoices detailing expenses pertaining to the Jenkins claim.[139]  In view of the evidence the court is permitted to consider, the court concludes as a matter of law that Prime did not breach its duty of good faith to settle the Jenkins' claim because it adequately communicated with CLJ regarding the policy limits.  No reasonable jury could conclude otherwise.

---

[133] Dkt. 168-2, Ex. 1, *Email and CLJ Healthcare, LLC Binder*.

[134] *Id.*

[135] *Motion* ¶ 20; Dkt. 114-13, *August 22, 2013 Letter* ("The limit of professional liability on the Policy is fifty thousand dollars ($50,000.00) with a Policy aggregate of one hundred thousand dollars ($100,000.00).  This limit decreases by expenses incurred in investigating and defending you.").

[136] *Motion* ¶¶ 20–21; Dkt. 114-13, *August 22, 2013 Letter*.

[137] *Motion* ¶¶ 29–30; *Response* at 4, 8; *November 4, 2013 Letter*.

[138] *Motion* ¶¶ 30–33; *Response* at 4 ("Plaintiffs do not dispute Defendants Statements of fact Numbers . . . 30–33."); *November 4, 2013 Letter*.

[139] *See* Dkt. 168-3, *Invoices*.

### B. Prime Did Not Breach its Good-Faith Duty in its Counteroffer Communications.

On April 15, 2014, Prime and CLJ received a letter from Jenkins with settlement demand of $2,100,000.[140] Jenkins agreed to accept $2,000,000 from Owners Insurance if Prime tendered $100,000.[141] Two days later, Prime retendered the remaining amount of CLJ's Policy, "for a mutually agreeable release."[142] CLJ argues Prime acted in bad faith by merely tendering the available limits and failing "to advise CLJ of the opportunity to contribute towards the settlement."[143] CLJ contends it was not enough for Prime to "simply respond[] to the demand," but rather it was required to "do what it [could] to effect settlement" and "buy some relief for CLJ."[144] Specifically, "[g]iven the fiduciary nature of the relationship between Prime and CLJ, CLJ's clear liability, and the very limited funds available, Prime should have informed CLJ of the opportunity to contribute."[145]

CLJ does not cite to any authority to support this argument.[146] As stated above, Prime's good-faith duty does not include a responsibility to generally advise CLJ. Additionally, Prime communicated to CLJ it was willing to tender the entire remaining funds for CLJ to use at it saw fit for defense or settlement of the claim in November 2013.[147] Prime also recommended CLJ

---

[140] *Motion* ¶¶ 36–37; *Response* at 4 (stating Plaintiffs do not dispute ¶¶ 36–37).

[141] *Id.*

[142] *Id.*

[143] *Id.* at 38–39.

[144] *Id.* at 39.

[145] *Id.*

[146] *See generally id.* at 38–39.

[147] *Motion* ¶ 32; *Response* at 4 ("Plaintiffs do not dispute Defendants Statements of fact Numbers . . . 30–33."); Dkt. 115-14 at 7–8, *November 4, 2013 Letter* (informing Dodds Prime retained counsel to defend the Jenkins claim and "Prime is willing to tender to you the entire remaining limit at this time for you to use as you see fit in the defense or settlement of this claim.").

retain counsel to advise it regarding settlement of the claim on multiple occasions.[148]  When Jenkins proposed a settlement arrangement, Prime tendered all remaining available funds two days later.[149]  Prime did what was required to protect CLJ's interests by "fairly and reasonably evaluat[ing] and settl[ing]" the Jenkins claim against CLJ by promptly communicating with CLJ and Jenkins' counsel regarding the Policy limits and tendering all available policy funds.[150]  In light of this conclusion, there are no factual issues left for a finder of fact and, therefore, no genuine issue for trial.[151]

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment[152] is GRANTED.  The Clerk of Court is directed to close the case.

SO ORDERED this 21st day of April 2025.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[148] *Motion* ¶¶ 25, 33; *Response* at 8 ("Plaintiffs do not dispute Defendants Statements of fact Numbers . . . 21–25, 30–33.); Dkt. 114-13, *August 22, 2013 Letter* ("I am writing to strongly encourage you to retain an attorney to advise you in this matter as your interests need to be considered in how best to proceed with defense or to attempt settlement and on what terms."); Dkt. 115-14 at 7–8, *November 4, 2013 Letter* ("Alternatively, Prime is willing to tender to you the entire remaining limit at this time for you to use as you see fit in the defense or settlement of this claim.  Please let Prime know if you would prefer to proceed in that manner.  You should consult with counsel regarding these issues.").

[149] *Response* at 38.

[150] *UMIA Ins., Inc. v. Saltz*, 515 P.3d 406, 416 (2022) (internal quotation marks and citation omitted); *id.* (describing the "duty to 'fairly and reasonably' settle claims against the insured" as "a duty to accept an offer of settlement within the policy limits when there is a substantial likelihood of a judgment being rendered against the insured in excess of those limits").

[151] *Liberty Lobby*, 477 U.S. at 250.

[152] Dkt. 168.